IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOHN COLASURDO,<br><br>        Plaintiff,<br><br>v.<br><br>NATHANIEL WARD, JEANNETTE COWAN, KIMBERLY BUTLER, CAMERON WATSON, SUSAN HILL, WILLIAM SPILLER, and TERRI WINGERTER,<br><br>        Defendants. | Case No. 3:17-CV-00424-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a motion for summary judgment filed by Defendants Nathaniel Ward, Jeannette Cowan, Kimberly Butler, Cameron Watson, Susan Hill, William Spiller, and Terri Wingerter (Doc. 152). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff John Colasurdo, an inmate of the Illinois Department of Corrections, filed this lawsuit pursuant to 28 U.S.C. § 1983 on April 25, 2017 (Doc. 1). Colasurdo alleges Defendants violated the Eighth Amendment to the United States Constitution when they failed to protect him while he was incarcerated at Menard Correctional Center (Doc. 88).

**I. Alleged Sexual Assaults From Late August Through October 2015**

On August 5, 2015, Colasurdo moved into the West Cell house at Menard (Doc. 153-10). Approximately ten days later, around August 15, 2015, Inmate Njos moved

into Colasurdo's cell (Doc. 153-1, p. 31). Njos allegedly sexually assaulted Colasurdo beginning in late August through October 2015, but Colasurdo did not request protective custody in August, September, or October 2015 (*Id*. at pp. 32, 38).

On November 7, 2015, Colasurdo requested protective custody, but did not mention Njos or any alleged sexual assault (Doc. 153-11, p. 4; Doc. 153-1, pp. 46-47). Instead, Colasurdo noted that he was offered three options: (1) "get messed up"; (2) pay one hundred fifty dollars up front and twenty percent of commissary each shop; or (3) seek protective custody (Doc. 153-11, p. 4). Colasurdo was immediately placed in protective custody awaiting an interview for a final decision (Doc. 153-3, p. 1). On November 17, 2015, Colasurdo requested to be released from protective custody before an investigation was concluded (Doc. 153-11, p. 3; Doc. 153-3).[1]

On November 20, 2015, Colasurdo was reassigned to the West Cell House at Menard (Doc. 153-1, p. 57; Doc. 153-10, p. 1). On that same day, Colasurdo reported to a mental health counselor that Njos sexually assaulted him between August and November 2015 (Doc. 88, pp. 52, 55). Colasurdo also reported that he signed out of Protective Custody "because he believe[d] he was going to be denied" (*Id*. at p. 52).

On November 29, 2015, Colasurdo filed an emergency grievance with Defendant Butler (Doc. 88, p. 39). In the emergency grievance, he alleged that he was raped by Njos between September and October 2015 (*Id*.). He also explained that it was Njos who gave him the three options noted above, and that in late November 2015, he met with an

---

[1] Interviews are typically done within ten days of an inmate signing into protective custody (Doc. 157-7, p. 9). Sometimes interviews are not completed within that time, however, if staff are not notified that the offender signed in (*Id*.).

internal affairs officer, and told him he wanted a "non-gang cellie" (*Id*.). Colasurdo noted that Njos told him that he is a "gang leader, whatever he says goes" (*Id*. at p. 40).

## II. January 21, 2016 Incident

On January 21, 2016, Colasurdo was allegedly attacked by Njos from behind (*Id*. at p. 20; Doc. 153-1, pp. 61-68). Colasurdo suffered several facial abrasions and cuts (Doc. 88, p. 46). As a result of his injuries, officers sent him to health care unit, and Colasurdo was seen by medical staff (*Id*. at p. 26). Colasurdo did not file a grievance regarding this incident until February 25, 2016 (Doc. 88, p. 20). Colasurdo did not request Protective Custody after the incident (Doc. 153-1, pp. 67-68), but he was interviewed by internal affairs, and he was put on investigative status for seventeen to twenty days (Doc. 153-1, p. 68; Doc. 88, p. 46). Colasurdo also put in a sick call request two days later because he still had pain in his chest and neck, and he requested to go to the dentist because of his chipped tooth (Doc. 88, p. 50).

## III. February 11, 2016 Incident

On February 11, 2016, Colasurdo was assaulted by inmate Diaz (Doc. 153-4; 153-1, pp. 73-79). Colasurdo did not know Diaz (Doc. 153-1, pp. 74-75). Colasurdo never met Diaz when he was living in the same cell as Njos (*id*.), but Diaz and Njos would have been part of a larger gang (Doc. 160, p. 15). As a result of the attack, on February 26, 2016, Colasurdo again requested protective custody (Doc. 88, p. 25). Colasurdo did not mention Diaz, but noted threats from Njos and a "Smiley D" (Doc. 153-11, p. 2). Colasurdo was immediately placed in protective custody awaiting an interview for a final decision (Doc. 153-3, p. 2). Defendant Spiller interviewed Colasurdo and recommended protective

custody (Doc. 153-1, p. 161; Doc. 153-7). Defendant Cowan also interviewed Colasurdo and recommended protective custody (153-1, p. 161; Doc. 153-3). After this attack, Colasurdo finally received protective custody and a Keep Separate Form (KSF) designation from Njos (Doc. 153-11). The protective custody documents note that "[Colasurdo] has been assaulted twice by the [redacted] after he alleged a [redacted] affiliate raped him" (*Id*. at p. 1).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." *Id.* (citation omitted).

## DISCUSSION

The Eighth Amendment prohibits cruel and unusual punishment of convicted persons, and safeguards inmates against pain and suffering that serves no penological purpose. *See* U.S. Const., amend. VIII; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and, by extension, correctional officers. "Omissions can violate civil rights, and 'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" *Chavez v. Illinois State Police*, 251 F.3d 612, 952-953 (7th Cir. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

To succeed on claim for failure to protect, an inmate must first demonstrate she is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, the inmate must show prison officials acted with deliberate indifference to that risk, which requires a subjective inquiry into a prison official's state of mind. *Id*. at 838-39. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prisoner may demonstrate that prison officials were aware of a specific, impending, and substantial threat to her safety "by showing that [s]he complained to prison officials about a specific threat to [her] safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (quoting *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991)).

The prison official may be held liable only if s/he knows an inmate faces a substantial risk of serious harm and "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

I. **Defendant Butler**

To be liable, "[s]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001); *Chavez*, 251 F.3d at 651. Defendant Butler argues she is entitled to summary judgment on all claims against her because she "had no personal involvement in any decisions involving Plaintiff and his requests for Protective Custody or his cell placement" (Doc. 153, p. 25). She continues conceding that "[a]lthough [she] was the Warden of Menard Correctional Center, she did not personally sign off on any of his requests for Protective Custody and was not personally responsible for placing him in a cell" (*Id*.).

Defendant Butler's involvement in the events leading up to and after the attacks show that she had actual knowledge of the threat to Colasurdo's safety. For instance, Defendant Butler approved Njos for double celling after receiving information that Njos had been disciplined for gang activity and fighting his cellmate (Doc. 160-1). Then after Colasurdo reported that he was sexually assaulted, Defendant Butler not only reviewed Defendant Ward's report from November 20, 2015, but also completed the PREA After-Action Checklist on November 20, 2015 (Doc. 88, pp. 56, 64). Then on January 26, 2016, Defendant Butler reported the PREA investigation findings (*Id*. at p. 35, Doc. 153-2, p. 2). Even assuming that Defendant Butler did not receive Colasurdo's grievance from

November 29, 2015, the evidence still shows that Defendant Butler had personal knowledge of Njos's gang affiliation, his prior altercations, his criminal history, and Njos's attack and threats to Colasurdo—which occurred while Colasurdo was still housed in the same unit as Njos. Accordingly, Defendants' Motion for Summary Judgment as to Butler is denied.

## II. Defendants Watson and Wingerter

Defendant Watson, Assistant Warden of Operations, was the chairperson of the Review Committee (Doc. 157-9, p. 5). Defendant Watson was involved in the decision to release Njos from administrative detention (Doc. 153, p. 6). Defendant Watson admits that he "regularly reviewed individuals who were assigned staff assaulter/weapons violator status based on their disciplinary findings" (Doc. 153, p. 28). Defendant Watson continues that he "was not responsible for placing inmates into particular cells" (*Id.* at p. 29).

As for Defendant Wingerter, she was the placement supervisor and made cell assignments (Doc. 157-10, p. 4). Defendant Wingerter claims she "was not aware of any information that would have made Inmate Njos a threat to Plaintiff's safety by assigning them to be celled together in August 2015" (Doc. 153, p. 32). Defendant Wingerter concedes that "Plaintiff [ ] complained that Inmate Njos was in a 'gang' and he was not, so he did not believe they should have been celled together" (*Id.* at pp. 32-33). According to Wingerter, "this is not a factor which would have prevented them from being celled together" (*Id.*). Defendant Wingerter also claims she was "never informed of any issue Plaintiff allegedly had with an inmate named Edgar Diaz" (*Id.* at p. 33).

Unlike Defendant Butler, there are no facts that show Defendants Watson and Wingerter had actual knowledge of a threat to Colasurdo's safety. Colasurdo merely sent Defendant Watson a letter on February 2015, months before he was even cellmates with Njos, regarding his black stripe status (Doc. 153-1, pp. 99-100). As for Defendant Wingerter, Colasurdo never sent a letter or had any interaction with her (Doc. 153-1, p. 164; Doc. 153-9; Doc. 157-10, p. 15).[2] There is no evidence of their actual knowledge of the threat to Colasurdo's safety. *Compare Al Momani v. Butler*, 2020 WL 5822047, at *7–8 (S.D. Ill. Sept. 30, 2020) (holding that Defendant Wingerter had personal involvement and knowledge of plaintiff's claims when plaintiff's letter stated, "I need to be moved from this cell because this inmate he's posing a threat for me that he's going to kill me, and the aggression level is different between me and him"). Accordingly, Defendants' Motion for Summary Judgment as to Watson and Wingerter is granted.

### III. Defendant Hill

Like other defendants, Defendant Hill claims she was not responsible for placing inmates into cells (Doc. 153, p. 31). Defendant Hill continues explaining that she "was not aware of any information that would have made Inmate Njos a threat to Plaintiff's safety when they were celled together in August 2015" (*Id.*). Defendant Hill notes that she "was also not aware of any issue Plaintiff had with an inmate named Edgar Diaz" (*Id.*). Defendant Hill continues pointing out that she "was not involved in the process for determining whether plaintiff would be granted Protective Custody" (Doc. 153, p. 32).

---

[2] The Court notes, however, that on December 29, 2015, Defendant Wingerter "[r]eceived a kite to void a money voucher in the amount of $600.00 payable to [redacted]" (Doc. 33-1, p. 3).

The problem is Defendant Hill was Colasurdo's Correctional Counselor "at the end of January and part of February 2016" (Doc. 153-8, p. 1). During this time, Colasurdo sent a grievance to Defendant Hill on February 8, 2016, requesting protective custody and mentioning Njos (Doc. 153-1, p. 122). Colasurdo's testimony is further confirmed by the Cumulative Counseling Summary showing that Defendant Hill was in contact with Colasurdo on January 22, 2016, and February 8, 2016—before the second attack from inmate Diaz (Doc. 33-1, p. 3). Accordingly, Defendants' Motion for Summary Judgment as to Hill is denied.

### IV. Defendants Cowan and Spiller

Defendant Cowan was a Correctional Casework Supervisor (Doc. 157-7, p. 5). As a Correctional Casework Supervisor, Defendant Cowan did protective custody interviews and file searches (*Id.*). When there is an interview for protective custody, Defendant Cowan reviews the offenders' master file (*Id.*). Defendant Cowan argues she "had no knowledge about a verifiable credible threat that created a substantial risk of harm to Plaintiff, which would warrant him being granted Protective Custody in November 2015" (Doc. 153, p. 26).

Defendant Spiller has been the Intelligence Coordinator at Menard since January 2015 (Doc. 153-7). As part of his duties, Spiller interviews inmates requesting Protective Custody (*Id.*). Spiller argues that he "did not make a recommendation to admit or deny [Colasurdo] from Protective Custody in November 2015, because he signed himself out of Protective Custody" (Doc. 153, p. 29).

Defendants Spiller and Cowan's arguments amount to an assertion that Colasurdo

signed himself out of Protective Custody, and they did not convince him otherwise (Doc. 153, p. 25). But there is evidence that Defendants Spiller and Cowan knew of the alleged sexual assault by inmate Njos—and his threats to Colasurdo—which show they had actual knowledge of a specific threat to Colasurdo's safety. On November 7, 2015, Colasurdo filed a request for Protective Custody noting that he was threatened (Doc. 88, p. 43). Then according to Colasurdo, he later explained to Defendants Cowan and Spiller—around November 17, 2015—that Njos sexually assaulted and threatened him (Doc. 153-1, p. 44). Despite this information, Colasurdo testified that Defendants Cowan and Spiller told him that he would be denied and convinced him that he should not proceed with protective custody (*Id.* at pp. 125-126). Besides Colasurdo's deposition testimony, in a Mental Health Progress Note, Colasurdo confirms that he signed out of Protective Custody "because he believe[d] he was going to be denied" (Doc. 88, p. 52).

Despite Colasurdo's request, he was still housed on the same gallery as Njos (Doc. 153-1, pp. 63-68). Then on January 21, 2016, Njos attacked him (Doc. 88, p. 46). Because there is sufficient evidence to establish that Defendants Spiller and Cowan had actual knowledge that Colasurdo faced a substantial risk of harm by remaining in close proximity to inmate Njos and they failed to address the risk, they are not entitled to summary judgment.

V. **Defendant Ward**

Defendant Ward was a Correctional Officer who was in the internal affairs unit from September 2015 through June 2016 (Doc. 153-4). Defendant Ward interviewed Colasurdo and Njos on November 20, 2015 (Doc. 153-4). During that interview,

Colasurdo explained that Njos repeatedly sexually assaulted him, and he advised Defendant Ward that Diaz was in the same gang as Njos (Doc. 157-5). Defendant Ward then assured Colasurdo that he would be separated from Njos (Doc. 153-1, p. 146).

On these facts, a jury could reasonably find that Ward "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from [Ward's] failure to prevent it." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997)). Ward's interview of Colasurdo put him on notice of impending harm, and his failure to separate Colasurdo from Njos supports the inference that he consciously refused to prevent the harm that occurred on January 21, 2016.[3] Accordingly, Colasurdo has presented sufficient evidence to raise a genuine issue of fact as to Ward's awareness of that risk and whether Ward took appropriate steps to protect Colasurdo. Defendants' Motion for Summary Judgment as to Ward is denied.

## VI. Qualified Immunity

Simply put, Defendants are not entitled to qualified immunity. "Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly

---

[3] There is very little information in the record about the January 21, 2016 attack (Doc. 88, pp. 20, 26, 46, 50). There is also little information in the record about Colasurdo's time in segregation on investigative status, and who talked to Colasurdo while he was on investigative status from January 21, 2016, to February 8, 2016 (Doc. 153-1, p. 71-73). But Defendant Ward was the one who investigated the November 20, 2015 and February 11, 2016 complaints.

incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: "(1) whether the facts, taken in the light most favorable to [ ] [Colasurdo], show that the defendant[s] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez*, 634 F.3d at 914 (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted)).

Defendants first argue that "the facts alleged here do not give rise to a Constitutional violation" (Doc. 153, p. 35). At the risk of being redundant, this Court disagrees, and the constitutional violations turn on the same genuine issues of material fact discussed above.

Next, Defendants argue that they are entitled to qualified immunity because "Defendants could not have known that they might be liable even though they recommended Plaintiff be granted Protective Custody or agreed to grant him Protective Custody in February 2016." (*Id.* at p. 36). Defendants' attempt to narrowly construe Colasurdo's claims are unsuccessful. In 2013, it was clearly established that the risk of an attack by a cellmate constitutes a risk of serious harm. *See Farmer*, 511 U.S. at 833 (stating that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."). Accordingly, Defendants are not entitled to qualified immunity.

## Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 152) is **GRANTED** as to Defendants Cameron Watson and Teri Wingerter. The

motion is **DENIED** at to Defendants Kimberly Butler, Jeannette Cowan, Nathaniel Ward, William Andrew Spiller, and Susan Hill.

This case shall proceed to trial on the issue of Defendants Butler, Cowan, Ward, Spiller, and Hill's deliberate indifference to Plaintiff John Colasurdo. A status conference will be set by separate order to establish final pretrial conference and trial dates.

**IT IS SO ORDERED.**

DATED: June 29, 2021

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**